# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALWINDER SINGH,<br><br>   Petitioner,<br><br>   v.<br><br>CALIFORNIA STATE,<br><br>   Respondent. | Case No. 1:23-cv-01589-NODJ-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.**

**BACKGROUND**

On April 16, 2021, Petitioner was convicted after a jury trial in the Tulare County Superior Court of attempted voluntary manslaughter. The jury found true the special allegations that Petitioner personally used a deadly and dangerous weapon and personally inflicted great bodily injury. (CT[1] 216–17.) On May 24, 2021, Petitioner was sentenced to an imprisonment term of seven years. (CT 238.) On September 9, 2022, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Singh, No. F082911, 2022 WL 4114089 (Cal. Ct. App. Sept. 9, 2022). On November 9, 2022, the California Supreme Court denied Petitioner's petition for review. (LDs[2] 7, 8.)

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 10.)
[2] "LD" refers to the documents lodged by Respondent. (ECF No. 10.)

1

On November 9, 2023, Petitioner filed a petition for writ of habeas corpus raising the following claims for relief: (1) instructional error; and (2) fraud, false evidence, and actual innocence. (ECF No. 1.) On December 12, 2023, Respondent filed an answer. (ECF No. 11.) To date, no traverse has been filed, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[3]

### INTRODUCTION

Appellant and defendant Balwinder Singh argued with Surender Kumar (Surender)[4] and stabbed him at least twice, including inflicting a chest wound that nicked an artery and caused extensive internal bleeding. Defendant was charged with attempted premeditated murder. At trial, there was evidence both men had been drinking. Surender testified that defendant stabbed him because he refused to make an insulting TikTok video with defendant. Defendant testified that Surender physically assaulted him, he pulled the knife in self-defense, and Surender was accidentally stabbed.

. . .

### FACTS

Defendant and Surender knew each other because they were from the same village in India. They were both truck drivers but worked for different companies. About 10 or 15 days before the charged incident, defendant called Surender, said he wanted to work for Surender's employer, and asked for the telephone number. Surender said he would talk to his company and let defendant know.

On the evening of November 28, 2020, defendant again called Surender, who lived in Bakersfield. Surender missed the call, called defendant back, and invited him to his house. Defendant said he was at a truck stop in Tulare, asked Surender to meet him there, and again asked for the trucking company's telephone number.

Surender picked up his friend, Mukesh Kumar (Mukesh), and drove to the Flying J. Truck Stop in Tulare. Surender did not drink anything before he left Bakersfield.

Sometime after midnight on November 29, 2020, Surender and Mukesh arrived at the truck stop. They found defendant sitting in his semitruck that was parked in the lot. Surender parked his Audi vehicle near the truck, and they joined defendant in the truck's cab. Surender had brought food and Jameson whiskey for defendant. Defendant ate the food and suggested they have a drink. Surender had two or three cups of whiskey and defendant drank from the bottle. Mukesh testified that he did not drink anything that night.

---

[3] The Court relies on the California Court of Appeal's September 9, 2022 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] We refer to certain parties by their first names because of their common last names; no disrespect is intended.

They ran out of alcohol and defendant suggested they get some more. They got into Surender's car, and he drove to a liquor store. Defendant told him to buy more Jameson, and Surender paid for it. Surender drove back to the truck stop, and the three men returned to the cab of defendant's truck. Surender testified that defendant was the only person who continued to drink; Surender and Mukesh did not drink after they returned from the liquor store.

Surender and Mukesh testified that defendant asked Surender to make a TikTok video with him. Defendant said he wanted to use "cuss" and "abusive" words on the video about certain people. Surender refused and said he would not say anything abusive about someone.

Surender testified that defendant became angry, said they were from the same village and Surender should help him, and an argument ensued. Surender and Mukesh got out of defendant's truck and went back to their car. Surender testified that as he got out of defendant's truck, defendant made a swinging motion toward him, and he was afraid defendant was going to attack him.

**Defendant Stabs Surender**

Surender got into the driver's seat of his car and Mukesh was in the front passenger seat. Surender felt the effect of his prior drinks, but he was not drunk. Defendant circled around Surender's car, and then got into the front passenger seat and Mukesh moved into the backseat.

Surender testified that he told defendant, "We are from the same village. I came from a distance to meet you. I brought food for you and I came along with my brother, and you are behaving like this to me."

Surender testified that defendant was holding a folding knife, and he listened to defendant with his head bowed. Defendant became angry, pulled out the knife, and stabbed Surender three or four times in the chest and arm while Surender sat in the driver's seat of his car. Mukesh testified that it was dark, and he saw defendant's hand make a stabbing movement, but he did not see the knife.

Surender got out of his car and could not understand what happened. Mukesh helped Surender into the truck stop's convenience store and asked for help. Surender collapsed inside the store and lost consciousness; the employees called 911 and applied pressure to his stab wounds.

**Initial Investigation**

At 12:50 a.m., Officer Brianna Blank of the Tulare Police Department arrived at the truck stop and found Surender lying inside the store. Surender had a stab wound on the right side of his chest that was about an inch long and actively bleeding; an employee was holding a towel over the wound. Surender was not in possession of a weapon.

Corporal Eric Wilson interviewed Mukesh, who did not speak very much English but directed him to Surender's car, an Audi, that was in the parking lot. Wilson approached the Audi and found defendant sitting in the driver's seat with his head down. The Audi's doors were closed, and the engine was running. Wilson and his partner had to bang on the car doors to get defendant's attention.

Defendant got out of Surender's car. There was a pool of blood on the driver's seat, and blood drops leading from the driver's door to the front of the store.

Corporal Wilson testified that defendant appeared intoxicated, lethargic, and impaired. Wilson did not recall if he smelled alcohol on defendant's breath. Wilson asked defendant if he was injured, and defendant pulled up his pants and pointed to his leg. Defendant did not have any visible injuries. There was a black folding knife in his right pocket, with a blade that was three and one-half inches long.

Later that night, Detective Scott interviewed Mukesh through a telephonic translation service. Mukesh said they went to the truck stop to confront defendant about a TikTok video he previously made.[5] Surender and defendant sat in the front seats of Surender's car, and Mukesh sat in the back seat. Surender and defendant started to argue about the video. Mukesh saw defendant swing his arms at Surender twice, but he did not see a knife.

**Surender's Injuries**

Surender was taken to Kaweah Delta Hospital. The emergency room physician who treated him testified that Surender had two linear lacerations on the right side of his chest that penetrated his chest cavity about three inches, nicked an artery, and resulted in blood pooling on the right side of his chest. Surender lost a significant amount of blood, approximately two liters, that consisted of 40 percent of his body's volume. He also had a laceration on his left hand, and a cut near his shoulder. Surender remained unconscious in the intensive care ward for three days.

When he was initially treated in the emergency room, Surender's blood-alcohol level was 0.22 percent.

**Surender's Pretrial Statements**

On December 3, 2020, while he was still in the hospital, Detective Scott interviewed Surender with the assistance of a translator. Surender said that he invited defendant to his house in Bakersfield, but defendant never showed up and they eventually made contact in Tulare. When they met, the three men drank alcohol, went to buy more alcohol, and then got into defendant's truck cab to continue drinking.

Surender said they started talking about videos defendant previously posted on TikTok. Surender told Detective Scott that defendant made derogatory comments in the videos about the Punjabi and Muslim cultures. Surender never said that defendant wanted to make a TikTok video with him that night.

Surender said he told defendant to stop making the videos because they would cause problems for their families in India. Surender said defendant was using a knife to cut up food, and he suddenly swung the knife at Surender and cut his hand while they were in the truck's cab.

---

[5] On cross-examination, Mukesh, who testified with the assistance of a translator, denied he previously told an officer that they went to Tulare so Surender could confront defendant about a video defendant previously posted on TikTok.

Surender said he ran to his car and got into the driver's seat. Defendant also ran to the car, got into the passenger seat, and stabbed Surender in the chest once.[6]

**Defendant's Trial Testimony**

Defendant testified at trial that he had lived in the United States for 25 years. Defendant stated that Surender called and insisted on meeting him in Tulare that night. When Surender arrived, he had a bottle of whiskey, but it was nearly empty, and defendant thought Surender and Mukesh had been drinking during their trip to Tulare.

Defendant testified that Surender and Mukesh got into his truck's cab, and they finished the rest of the bottle. Surender said they needed to buy more liquor, and they went to a liquor store in Surender's car. Surender wanted defendant to return to his home in Bakersfield, but defendant refused. They went back to the truck stop and again got into defendant's truck cab.

Defendant testified that he was drunk, and Surender and Mukesh were more intoxicated that he was.

Defendant testified that he was using a knife to cut lettuce for a salad. Surender and Mukesh wanted defendant to make a TikTok video insulting certain people. Defendant refused. Surender grabbed defendant's neck with both hands, and Mukesh punched defendant in the face three or four times. Defendant told them to get out, and they left the truck.

A few minutes later, defendant got out of his truck to use the restroom at the truck stop. He still had the knife that he used to cut the lettuce. Surender and Mukesh were standing behind Surender's car. Surender walked up to defendant and asked if he called the police. Defendant said no, and that they should leave because they were drunk.

Surender kicked defendant in the leg and groin. Defendant told Surender to stay away from him, but Surender kept coming at him aggressively.

Defendant testified that he pulled his knife because this was Surender's second attack on him, Mukesh was directly behind Surender, and defendant was afraid both Surender and Mukesh would attack him.

Defendant held the knife in his right hand, extended his arm, and waved around the knife. Surender told defendant that he could not stab him, lunged at defendant, and Surender "got struck with the knife once I think."

Defendant was not trying to stab or kill Surender, he only wanted to scare him, but Surender "was kind of jumping toward me ... and I had the knife in my hand and I think maybe once" stabbed him. Defendant insisted the stabbing occurred in the parking lot behind Surender's car, and not in Surender's car.

---

[6] On cross-examination, Surender admitted he told Detective Scott that they were in the truck's cab, defendant was cutting salad with a knife, and defendant stabbed him in the hand. On further examination, Surender conceded he was not stabbed while he was in defendant's truck, and he may not have been clear when he made his statement about what happened. Surender also testified that his first language was Hindi, but he was interviewed with a Punjabi translator. Surender knew some Punjabi and could understand the translator, but he had problems communicating with that person, who did not know much Hindi.

5

> After defendant stabbed him, Surender and Mukesh went into the store at the truck stop. Defendant testified that he got back into his truck and did not enter Surender's car or start the engine. Defendant was going to call 911 but did not make the call because he figured someone in the store would do that, and he did not know the address of the truck stop. He waited in his truck for the police arrive.
>
> On cross-examination, defendant testified that he was drunk, but he had a clear memory of most of the night. He was interviewed at the scene by an officer, but he was unable to explain what happened because he did not speak English well.
>
> Also on cross-examination, defendant admitted that a TikTok video was made on his account from his cell phone that night, the video showed defendant hold up his knife to the camera, and it could have been the same knife he used to stab Surender. Defendant testified Surender grabbed his cell phone and forced him to make the video.
>
> **Rebuttal**
>
> Detective Scott testified that he interviewed Mukesh at the scene, and Mukesh did not appear intoxicated or impaired. There was no blood or splatter found behind Surender's parked car.

Singh, 2022 WL 4114089, at *1–4 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

///

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 584 U.S. 122, 125 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at

99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Instructional Error

Attached to the petition is a copy of Petitioner's opening brief filed in the California Court of Appeal, which raised a claim asserting that the trial court denied Petitioner his constitutional right to present a complete defense and due process when it failed to instruct the jury that attempted voluntary manslaughter requires a specific intent that voluntary intoxication could negate. (ECF No. 1 at 17.[7]) The California Court of Appeal denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

---

[7] Page numbers refer to the ECF page numbers stamped at the top of the page.

In denying the instructional error claim, the California Court of Appeal stated:

Defendant argues that while the trial court agreed to instruct the jury that voluntary intoxication was relevant to the specific intent required for both attempted murder and attempted voluntary manslaughter, CALCRIM No. 3426 stated that voluntary intoxication was relevant only to attempted murder and did not refer to the lesser included offense of attempted voluntary manslaughter.

Defendant further notes that the attempted voluntary manslaughter instructions in CALCRIM Nos. 603 and 604 correctly stated the offense required the intent to kill, but the court failed to modify CALCRIM No. 251 to state that attempted voluntary manslaughter was a specific intent crime, that would have referred the jury back to the instruction that voluntary intoxication negated the specific intent to kill for the lesser included offense. Defendant argues these instructional errors were prejudicial.

We begin with the elements of the charged and lesser included offenses, and when an instruction on voluntary intoxication should be given.

**I. Murder and Manslaughter**

"Murder is the unlawful killing of a human being with malice aforethought. [Citation.] Malice may be either express or implied. It is express when the defendant manifests 'a deliberate intention unlawfully to take away the life of a fellow creature.' [Citation.] It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 107, fn. omitted.) "Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327.)

"Manslaughter is 'the unlawful killing of a human being without malice.' [Citation.] A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense" – the unreasonable but good faith belief in having to act in self-defense [citation].' " (*People v. Lasko, supra*, 23 Cal.4th at p. 108.) Imperfect self-defense and heat of passion are not affirmative defenses but shorthand descriptions of the forms of voluntary manslaughter. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231–1232.)

Voluntary manslaughter can be committed intentionally, but the specific intent to kill "is not a necessary element of voluntary manslaughter," and voluntary manslaughter is also committed "when one kills unlawfully, and with conscious disregard for life, but lacks malice because of provocation or imperfect self-defense." (*People v. Rios* (2002) 23 Cal.4th 450, 461, fn. 7, italics omitted from original; *People v. Martinez* (2007) 154 Cal.App.4th 314, 335.)

**II. The Charged and Lesser Included Offenses**

An attempt to commit a crime requires the specific intent to commit that crime, even if specific intent is not required to commit the underlying crime. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]"

(*People v. Booker* (2011) 51 Cal.4th 141, 177–178; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 (*Mendoza*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Thus, while murder may be premised on a conscious disregard for life, attempted murder requires the specific intent to kill. (*Ibid.*) In addition, the crime of attempted murder is not divided into degrees, but the prosecution may seek a finding that the attempted murder was willful, deliberate, and premeditated for purposes of sentence enhancement. (*Id.* at p. 740.)

In contrast to the completed offense of voluntary manslaughter, the lesser included offense of attempted voluntary manslaughter similarly requires the specific intent to kill. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549–1550; *People v. Gutierrez, supra*, 112 Cal.App.4th at p. 710; *People v. Lasko, supra*, 23 Cal.4th at p. 107; *People v. Bland, supra*, 28 Cal.4th at pp. 327–328.)

It is well settled that attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) In this case, the court instructed on attempted murder, with attempted voluntary manslaughter, based on both heat of passion or imperfect self-defense, as the only lesser included offense.

### III. Voluntary Intoxication

Evidence of voluntary intoxication is admissible only when the defendant is charged with a specific intent crime, and only on the issue of whether the defendant actually formed the required specific intent for that crime. (§ 29.4, subd. (b); *People v. Berg* (2018) 23 Cal.App.5th 959, 965–966; *Mendoza, supra*, 18 Cal.4th at pp. 1121–1122, 1124.)

Evidence of voluntary intoxication is admissible to raise a reasonable doubt as to whether defendant had the specific intent required to prove both attempted murder and attempted voluntary manslaughter, since both the charged and lesser included offenses were specific intent crimes. (See, e.g., *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

### IV. The Court's Instructional Duties

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.] That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on ..., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' [Citation.] But ' "when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request." ' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.)

An instruction on voluntary intoxication is a pinpoint instruction, and the trial court is not required to give this instruction in the absence of a request. (*People v. Bolden* (2002) 29 Cal.4th 515, 559; *People v. Rundle* (2008) 43 Cal.4th 76, 145.)

Even upon request, the defendant is entitled to such an instruction only where there is substantial evidence the defendant was intoxicated at the time of the crime. (*People v. Verdugo* (2010) 50 Cal.4th 263, 265; *People v. Williams* (1997) 16 Cal.4th 635, 677.)

**V. The Instructions Given in This Case**

During the instructional conference, defense counsel requested the court to give a pinpoint instruction on voluntary intoxication as relevant to the specific intent required for both the charged offense of attempted murder and the lesser included offense of attempted voluntary manslaughter. Over the prosecutor's objection, the court found sufficient evidence that defendant was intoxicated, agreed that attempted voluntary manslaughter was also a specific intent offense, and stated it would give the requested instructions for both the charged and lesser included offenses. The court's legal and factual findings were correct.

As set forth above, the court correctly instructed the jury on the elements of attempted murder in CALCRIM Nos. 600 and 601, and that attempted murder required the intent to kill. The court instructed the jury with CALCRIM Nos. 603 and 604 on the lesser included offense of attempted voluntary manslaughter, based on both heat of passion and imperfect self-defense, and the instructions correctly stated that both theories of attempted voluntary manslaughter required the intent to kill.

While these instructions correctly defined the charged and lesser included offenses, defendant's claim of instructional error is based on the court's failure to modify the instructions on both intent and voluntary intoxication to address the lesser included offense.[8] CALCRIM No. 251 correctly stated that to find defendant guilty of attempted murder, or find true the allegations of great bodily injury and use of a dangerous or deadly weapon, "the person ... must not only show he intentionally committed the prohibited act, but must do so with *a specific intent*. The act and specific intent required are explained in the instruction for that crime or allegation," but this instruction also stated: "*The specific intent required for the crime of attempted murder is intent to kill.*" (Italics added.) This instruction was not modified to state that attempted voluntary manslaughter also required the specific intent to kill.

CALCRIM No. 3426 on voluntary intoxication correctly stated the jury could consider evidence, if any, of defendant's voluntary intoxication in a limited way, "only in deciding whether the defendant acted with specific intent," but it also stated: "In *connection with the charge in Count 1*, the People have the burden of proving beyond a reasonable doubt that the defendant acted *with specific intent to kill*. If the People have not met this burden, you must find the defendant not guilty of attempted murder. *You may not consider evidence of voluntary intoxication for any other purpose.*" (Italics added.) This instruction was not modified to state that voluntary intoxication could also be considered in determining if defendant acted with the intent to kill required for attempted voluntary manslaughter.

---

[8] While defense counsel requested the pinpoint instruction on voluntary intoxication as to both attempted murder and attempted voluntary manslaughter, she did not object when the court read the actual instructions to the jury, or claim the instructions were erroneous or misleading. As previously noted, when the court chooses to give a pinpoint instruction, it must do so correctly. (*People v. Castillo, supra*, 16 Cal.4th at p. 1015.) Where the defendant asserts that a given instruction was legally incorrect, an objection is not required and the issue may be addressed on appeal. (*People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

12

While a trial court does not have a sua sponte duty to instruct on voluntary intoxication, "if it does instruct ..., it has to do so correctly." (*Mendoza, supra*, 18 Cal.4th at p. 1134.) The court should have modified CALCRIM No. 251 to state that attempted voluntary manslaughter required specific intent, and CALCRIM No. 3426 to state that evidence of voluntary intoxication was also relevant to negate the specific intent required for attempted voluntary manslaughter.

**VI. Prejudice**

We must thus determine whether the instructional errors on voluntary intoxication and attempted voluntary manslaughter were prejudicial.

Defendant acknowledges that CALCRIM Nos. 603 and 604 correctly stated the elements of attempted voluntary manslaughter, based on both theories, and that one element was proof of an intent to kill. However, defendant asserts the failure to give accurate and complete instructions in CALCRIM Nos. 251 and 3426 on specific intent, attempted voluntary manslaughter, and voluntary intoxication removed a factual issue from the jury's consideration, prohibited the jury from considering voluntary intoxication for any purpose other than attempted murder, the omission violated his due process right to present a defense, and the instructional errors are subject to review under *Chapman v. California* (1967) 386 U.S. 18.

Defendant further argues the errors are not harmless beyond a reasonable doubt under *Chapman* because "there is a reasonable likelihood that the jurors applied the instructions in a way that prevented the consideration of constitutionally relevant defense evidence on whether [he] had the specific intent to kill required for attempted voluntary manslaughter, or whether he could not form that intent due to voluntary intoxication. [¶] [¶] Had the jury been instructed that voluntary intoxication could also negate the specific intent required for attempted voluntary manslaughter, it cannot be said beyond a reasonable doubt that the jury would not have acquitted [defendant] of that offense as well."

As previously noted, "[a]though a trial court has no sua sponte duty to give a 'pinpoint' instruction on the relevance of evidence of voluntary intoxication, 'when it does choose to instruct, it must do so correctly.' [Citation.] We apply the 'reasonable probability' test of prejudice to the court's failure to give a legally correct pinpoint instruction." (*People v. Pearson* (2012) 53 Cal.4th 306, 325, fn. omitted.) The failure to give a fully inclusive pinpoint instruction on voluntary intoxication does not deprive a defendant of his due process right to a fair trial and present a defense. (*Id.* at p. 325, fn. 9.)

If the court erroneously instructs the jury on voluntary intoxication as to whether it negates the requisite mental state for an offense, the error is subject to review under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Atkins* (2001) 25 Cal.4th 76, 93.) An instructional error that limits the jury's consideration of voluntary intoxication evidence is "subject to the usual standard for state law error," under which " 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' " (*Mendoza, supra*, 18 Cal.4th at pp. 1134; *id.* at pp. 1134–1135.)

We review defendant's claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The instructions must be reviewed "as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence" in deciding the

13

lesser included offense of attempted voluntary manslaughter. (*Mendoza, supra*, 18 Cal.4th at p. 1134.) The omission of an instruction on a defense is not prejudicial if the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. (*People v. Wright* (2006) 40 Cal.4th 81, 98–99.)

Defendant alternatively asserts the instructional errors in this case are still prejudicial under *Watson*: "Given the acquittal on attempted murder, there is a reasonable chance that a properly instructed jury would have determined from the strong and undisputed evidence of [defendant's] voluntary intoxication that he could not form the necessary specific intent to kill. In that event, he would have also been acquitted of attempted voluntary manslaughter." Defendant thus concludes that since the jury acquitted him of attempted murder "after being instructed that voluntary intoxication could negate the specific intent to kill required for attempted murder," there is a reasonable probability under *Watson* "that a properly instructed jury would have determined from the strong and undisputed evidence of [defendant's] voluntary intoxication that he also could not form the necessary specific intent to kill that is required for attempted voluntary manslaughter," and he would have been acquitted.

*Analysis*

We find the instructional errors in this case were not prejudicial based on the entirety of the instructions and the record. First, the jury was correctly instructed on the elements of attempted voluntary manslaughter under the theories of heat of passion and imperfect self-defense, and that the offense required defendant have the intent to kill under both theories. Defendant was found not guilty of attempted murder, and guilty of the lesser included offense of attempted voluntary manslaughter. We cannot say that this verdict resulted from the jury's finding that defendant's voluntary intoxication negated the specific intent required for attempted murder. Instead, the record equally supports the conclusion that the jury reached these verdicts by relying on either imperfect self-defense or heat of passion, based on the trial evidence about the heated disputed and possible misunderstandings between defendant and Surender, independent of defendant's alleged intoxication.

We further note the court correctly instructed the jury with CALCRIM Nos. 3145 and 3160 on the elements of the enhancements alleged as to both the charged and lesser included offenses – personal use of a deadly weapon and infliction of great bodily injury. These two instructions stated that if the jury found defendant guilty of either attempted murder or attempted voluntary manslaughter, the jury also had to determine if each enhancement was true. Moreover, CALCRIM No. 251 addressed the specific intent required not only for attempted murder but also for the two enhancements: "... For you to find a person guilty of the crime of attempted murder *or to find the allegations of great bodily injury and use of a dangerous or deadly weapon true, the person ... must not only show he intentionally commit the prohibited act, but must do so with a specific intent.*" (Italics added.) The voluntary intoxication instruction stated the jury could consider evidence, if any, of defendant's voluntary intoxication "only in *deciding whether the defendant acted with specific intent.*" (Italics added.)

" 'We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' " (*People v. Homick* (2012) 55 Cal.4th 816, 867.)

The jury was instructed that if it convicted defendant of the lesser included offense of attempted voluntary manslaughter, it still had to address the two enhancements, that both enhancements required proof of specific intent, and that it could consider whether evidence of defendant's voluntary intoxication negated the requisite specific intent. The jury herein found defendant not guilty of the charged offense of attempted murder, guilty of the lesser included offense of attempted voluntary manslaughter and, more importantly, found true both enhancements that he personally used a deadly weapon and personally inflicted great bodily injury. The jury's guilty verdict on attempted voluntary manslaughter and true findings on both enhancements show that it rejected any claim that defendant's voluntary intoxication undermined his specific intent in this case, such that any instructional errors were not prejudicial. In addition, by finding the personal use enhancement true, the jury necessarily found the People met the burden of proving beyond a reasonable doubt that defendant "intentionally stabbed" Surender, as stated in CALCRIM No. 3145, further indicating that it rejected his testimony that he did not intentionally stab Surender.

Defendant further argues the instructional errors were prejudicial because the errors prevented the jury from relying on defendant's voluntary intoxication to negate the specific intent required for attempted voluntary manslaughter, and that in the absence of the errors, he would not have been convicted of any offense. In her closing argument, defense counsel did not address any issues regarding voluntary intoxication and attempted voluntary manslaughter. Instead, counsel argued defendant was not guilty of any offense based on either perfect self-defense and/or accident, and cited defendant's trial testimony that Surender initially attacked him in the truck cab, he was afraid of Surender and Mukesh, he pulled his knife in the parking lot because he thought they were both going to attack him, Surender lunged at him and was stabbed once by accident, he never intended to stab Surender, and the stabbing occurred in the parking lot behind Surender's parked car and not inside the car.

The jury was correctly instructed that it could find defendant not guilty of any crime based on either perfect self-defense and/or accident. A person is not guilty of a crime if the act charged was committed "through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." (§ 26 (5).) "The accident defense amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." (*People v. Lara* (1996) 44 Cal.App.4th 102, 110.) "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. [Citation.] A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) The defense of perfect self-defense also applies to an attempted killing. (*People v. Randle*, at p. 994.)

"Appellate review under *Watson* ... focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

15

> It is not reasonably probable that defendant would have been acquitted of all charges absent the instructional error. If the jury found defendant accidentally stabbed Surender or had a reasonable belief in self-defense, it would have found him not guilty of any criminal offense, including attempted voluntary manslaughter, regardless of the voluntary intoxication instruction. Defendant's trial claims of accident and perfect self-defense, and his bid for an acquittal, were undermined by the undisputed physical evidence at the scene. Defendant testified that he pulled the knife in self-defense and accidentally stabbed Surender when they were standing in the parking lot behind Surender's parked car; it was undisputed there was a pool of blood on the driver's seat of Surender's car, blood drops led into the store, and there was no evidence of blood behind Surender's car. Defendant testified that he stabbed Surender one time when Surender lunged or jumped at him; Surender's treating physician testified that he suffered two linear lacerations on the right side of his chest that penetrated his chest cavity about three inches and nicked an artery, he had another laceration on his left hand and a cut on his shoulder, and that testimony was not disputed. Finally, defendant testified that he got into his truck cab and waited for the police to arrive; it was undisputed that when the officers arrived, defendant was sitting in the driver's seat of Surender's car with the engine running.
>
> We conclude the instructional errors were not prejudicial.

Singh, 2022 WL 4114089, at *9–15 (footnotes in original).

"[T]he fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). The "only question for [a federal habeas court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). In reviewing an ambiguous instruction, the Court "inquire[s] 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution," while "also bear[ing] in mind [the Supreme Court's] previous admonition that [it] 'ha[s] defined the category of infractions that violate "fundamental fairness" very narrowly.'" Estelle, 502 U.S. at 72 (first quoting Boyde v.

1 California, 494 U.S. 370, 380 (1990); then quoting Dowling v. United States, 493 U.S. 342, 352
2 (1990)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a
3 misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

4 To the extent that Petitioner asserts the state trial court violated his due process right to a
5 fair trial, the Court finds that the appellate court's determination that "[t]he failure to give a fully
6 inclusive pinpoint instruction on voluntary intoxication does not deprive a defendant of his due
7 process right to a fair trial," Singh, 2022 WL 4114089, at *13, was not objectively unreasonable.
8 As noted by the California Court of Appeal, "[t]he jury was instructed that if it convicted
9 defendant of the lesser included offense of attempted voluntary manslaughter, it still had to
10 address the two enhancements, that both enhancements required proof of specific intent, and that
11 it could consider whether evidence of defendant's voluntary intoxication negated the requisite
12 specific intent." Singh, 2022 WL 4114089, at *13. "[I]n the context of the instructions as a whole
13 and the trial record," Estelle, 502 U.S. at 72, given that the error was an incomplete instruction
14 rather than a misstatement of law, and in light of the jury's true findings on both enhancements,
15 Petitioner has not demonstrated that "no 'fairminded juris[t]' could have reached the same
16 judgment as the state court," Shinn v. Ramirez, 596 U.S. 366, 378 (2022) (alteration in original)
17 (quoting Harrington, 562 U.S. at 102). See Victor v. Nebraska, 511 U.S. 1, 6 (1994) ("[W]e
18 made clear that the proper inquiry is not whether the instruction 'could have' been applied in an
19 unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply
20 it." (quoting Estelle, 502 U.S. at 72)).

21 To the extent that Petitioner asserts the state court violated his right to present a complete
22 defense, the Court finds that the appellate court's determination that "[t]he failure to give a fully
23 inclusive pinpoint instruction on voluntary intoxication does not deprive a defendant of his due
24 process right to . . . present a defense," Singh, 2022 WL 4114089, at *13, was not objectively
25 unreasonable. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to
26 present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California
27 v. Trombetta, 467 U.S. 479, 485 (1984)). However, the cases in which the Supreme Court
28 invoked the principle of a criminal defendant's right to present a complete defense "dealt with

the exclusion of evidence or the testimony of defense witnesses" and did not "involve[] restrictions imposed on a defendant's ability to present an affirmative defense," Gilmore v. Taylor, 508 U.S. 333, 343 (1993) (citations omitted). The Supreme Court rejected the argument "that the right to present a defense includes the right to have the jury consider it, and that confusing instructions on state law which prevent a jury from considering an affirmative defense therefore violate due process" because "such an expansive reading of our cases would make a nullity of the rule reaffirmed in *Estelle v. McGuire, supra,* that instructional errors of state law generally may not form the basis for federal habeas relief." Gilmore, 508 U.S. at 344.

Accordingly, the Court finds that the state court's rejection of the instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

**B. Second Ground for Relief**

Petitioner also appears to raise a second claim, stating: "Police lost original report make on fraud store the charge attempt to murder case. I am innocent in prison." (ECF No. 1 at 14.) Respondent argues that no prior Supreme Court case has clearly established the elements of an actual innocence claim and Petitioner does not meet the Ninth Circuit's de novo standard. With respect to false evidence, Respondent contends that this "seems to just ask this Court to find Petitioner credible in an alternate version of facts that jurors already heard and found false beyond a reasonable doubt." (ECF No. 11 at 15.)

1. Fraud and False Evidence

"The knowing use of false evidence by the state, or the failure to correct false evidence, may violate due process." Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)). "To establish a Napue claim, a petitioner must show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material.'" Towery, 641

F.3d at 308 (quoting United States v. Zuno–Arce, 339 F.3d 886, 889 (9th Cir. 2003)). In assessing materiality, the Court must determine whether "there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Soto v. Ryan, 760 F.3d 947, 958 (9th Cir. 2014) (quoting Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005)).[9] A court need not review all three Napue prongs if a petitioner's argument fails at any one of the prongs. See Panah v. Chappell, 935 F.3d 657, 664 (9th Cir. 2019); Towery, 641 F.3d at 308.

Here, Petitioner claims that the police lost the original report. However, it is unclear what specific evidence that was presented at trial Petitioner asserts is false. Accordingly, Petitioner is not entitled to habeas relief on the ground that the prosecution knowingly presented false testimony or evidence.

2. Actual Innocence

The Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin v. Perkins, 569 U.S. 383, 392 (2013). Accord Prescott v. Santoro, 53 F.4th 470, 482 (9th Cir. 2022). The Ninth Circuit has "stated that, to the extent a federal actual innocence claim exists, a petitioner asserting such a claim need assert more than that insufficient evidence supported the petitioner's conviction." Prescott, 53 F.4th at 482 (citing Carriger v. Stewart, 132 F.3d 463, 476–77 (9th Cir. 1997) (en banc)). "Instead, the petitioner must demonstrate that in light of new evidence, it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt." Prescott, 53 F.4th at 482 (brackets and citations omitted). "This new evidence must be reliable, and the reviewing court 'may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" Id. (citations omitted).

Here, Petitioner merely claims that he is innocent but does not provide any new evidence to support his claim of innocence. Therefore, to the extent that a freestanding claim of actual

---

[9] "There is nothing in Napue, its predecessors, or its progeny, to suggest that the Constitution protects defendants only against the knowing use of perjured testimony. Due process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence." Hayes, 399 F.3d at 981.

19

innocence is cognizable in a federal habeas corpus proceeding in the non-capital context, the Court finds that Petitioner is not entitled to relief.

## V.

## RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 6, 2024**

UNITED STATES MAGISTRATE JUDGE